**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 23-cr-73 (CKK)** |
| | : | |
| **TERON MCNEIL (8),** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On August 26, 2025, Defendant Teron McNeil pleaded guilty to one count of Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of Fentanyl and two counts of Conspiracy to Commit Wire Fraud. For the reasons herein, the Government respectfully requests that the Court sentence the Defendant to 121 months of imprisonment, followed by 60 months of supervised release.

**BACKGROUND**

From beginning in or about August 2020 to around June 9, 2023, the Defendant conspired to distribute and possess with intent to distribute fentanyl. Specifically, the Defendant participated in a fentanyl trafficking conspiracy whose purpose was to distribute fentanyl from Southern California to destinations throughout the United States, including to the District of Columbia.

The Defendant entered into this conspiracy after he was introduced to a Los Angeles-based drug trafficker, who was a distributor of fentanyl-laced counterfeit oxycodone pills. The Defendant's role in this conspiracy was to travel to Southern California in order to purchase fentanyl-laced counterfeit oxycodone pills from this trafficker and then bring those pills back to the District of Columbia. In transporting the pills back to the District of Columbia, the Defendant and his co-conspirators utilized two primary methods: smuggling the pills while concealed in luggage and/or

personal carry-on items, or alternatively, utilizing commercial mail carriers to ship the pills to the District of Columbia. Through these actions, the Defendant conspired with the L.A.-based drug trafficker to purchase bulk, distribution-level quantities of fentanyl-laced counterfeit oxycodone pills. The Defendant then conspired with others to bring the pills back to the District of Columbia for redistribution.

In arranging his smuggling of tens of thousands of pills back to the District of Columbia, the Defendant typically negotiated with the L.A.-based drug trafficker the price per pill to be paid in advance of the Defendant travelling to Los Angeles. Similarly, for fentanyl-laced counterfeit oxycodone pills purchased by the Defendant from the L.A.-based drug trafficker that were shipped to the Defendant, the Defendant would negotiate a price in advance, and subsequently pay the L.A.-based drug trafficker for the shipped pills via electronic payment methods, most typically Apple Pay or Cash App. In arranging a shipment, the Defendant would provide a shipment address to which the L.A.-based drug trafficker was to ship a package of pills.

For example, on December 7, 2021, the United States Postal Inspection Service intercepted a package mailed from Carson, California addressed to John Turner, 509 33rd Street SE, Washington, D.C. 20019. Inside the parcel, a large Ziploc bag containing more than 1,000 blue pills, weighing approximately 122 grams in aggregate, was discovered. The pills were tested and tested positive for the presence of a fentanyl analogue. Payment records reveal that the Defendant sent two payments to the L.A.-based drug trafficker via Apple Pay in the weeks preceding and following the interdiction. Further, call detail records for the Defendant reveal that he called the L.A.-based drug trafficker approximately 30 times from December 5-8, 2021, including after the package was seized.

Upon either successfully smuggling fentanyl-laced counterfeit oxycodone pills back from California and/or receiving shipments of pills, the Defendant then resold those pills in and around

the District of Columbia in coordination with his D.C.-based co-conspirators.

Further, after entering into the conspiracy, the Defendant fraudulently applied for and received unemployment insurance (UI) funds from the states/localities California and Maryland. In his California unemployment application based on alleged prior employment with Entity 1, he said he had not worked anywhere else in the past 18 months despite claiming in a separate California application that he had worked at Taco Bell about 13 months before his Entity 1 application. In his California unemployment applications based on alleged prior employment with Entity 2 and Entity 3, he made the same representation despite having allegedly worked at Entity 1 during the prior 18 months. At least one of these statements was false. In total, the Defendant received approximately $11,151 in unemployment funds from California and $33,236 from Maryland. The Defendant conspired with Karon Blalock in this scheme. They each submitted California unemployment applications within one month of each other in 2020. Further, on July 26, 2020, Blalock asked the Defendant, "U already did ur unemployment"? The Defendant answered, "Fucked up."

Similarly, the Defendant fraudulently applied for and received a forgivable loan from the Small Business Administration (SBA) during the COVID-19 Pandemic. The Defendant received one Paycheck Protection Program (PPP) loan. He agreed to do so with others, including co-defendant Karon Blalock. As part of the scheme, the Defendant claimed that he was self-employed, an independent contractor, or in a sole proprietorship, which is undermined by his claims in state unemployment applications that he was employed elsewhere. Further, as part of the scheme, the Defendant included in his applications multiple 1099-Ks for the year 2020. One of those reported $9,514.50 in transactions from that year, but the monthly amounts do not add up to that number, and the other reported $73,514.50 in transactions to him. Over the course of the conspiracy, the Defendant received approximately $20,833.00 in PPP funds. His co-conspirators received $83,332.00 in PP

funds.

## SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report ("PSR") calculation that the Defendant has two Criminal History points, resulting in a Criminal History Category of II. PSR at ¶ 154. The Government also concurs with the PSR that the Defendant's Total Offense Level is 32,[1] before any downward adjustments, and that the Defendant qualifies for a three-point reduction to his offense level. PSR at ¶¶ 141, 143-146. Thus, the total offense level of 29, along with a Criminal History Category of II, results in a corresponding range of imprisonment under the Guidelines of 97 months to 121 months, with a mandatory minimum of 120 months of imprisonment to be imposed as required by statute. PSR at ¶ 215.

## LEGAL PRINCIPLES

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *United States v. Rita*, 551 U.S. 338, 348-50 (2007). The Section 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the Sentencing Guidelines; (5)

---

[1] The PSR applied U.S.S.G. § 2B1.1(b)(12). *See* PSR at ¶ 134. The Government is not seeking the application of that enhancement, but it is immaterial to the final Guidelines calculation.

any related Sentencing Commission policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution to any victims.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 542 U.S. 296 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory. *Booker*, 543 U.S. at 245. Nonetheless, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *See Gall*, 128 S. Ct. at 598 ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark"). The Guidelines are the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions. *See Rita*, 551 U.S. at 338; *see also* United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); 28 U.S.C. § 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 438 (Commission should produce a "complete set of guidelines that covers in one manner or another all important variations that commonly may be expected in criminal cases"). In addition, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns." *Booker*, 543 U.S. at 264 (the Sentencing Commission will continue "collecting information about actual district court sentencing decisions . . . and revising the Guidelines accordingly").

The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). Any Guidelines calculation is based on the individual characteristics of the offense and the offender, as required by Section

3553(a)(1). The Guidelines themselves thus seek to implement—in a fair and uniform way—the offense specific characteristics that, themselves, comprise the "individualized assessment" the Supreme Court commends in *Gall*. *See Gall*, 552 U.S. at 50.

## ARGUMENT

A sentence of 121 months of imprisonment is appropriate in light of the seriousness of the offenses and the Defendant's criminal history. The Government's recommended sentence is also designed to deter others, promote respect for the law, and offer rehabilitation to the Defendant.

### 1.     The Nature, Circumstances, and Seriousness of the Offense

The count to which the Defendant pleaded guilty is serious. First, he joined a fentanyl trafficking conspiracy that spanned the country and that was responsible for the distribution of kilograms of fentanyl to the D.C. area and elsewhere. The Defendant's participation in this fentanyl conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, "Fentanyl is a Schedule II controlled substance that is similar to morphine but about 100 times more potent. . . . Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction. . . . Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *See* DEA, *Facts about Fentanyl*.[2] The lethality of fentanyl is reflected in nationwide statistics: roughly 73,690 people in this country died of drug overdoses in the 12-month period ending in April 2025. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of September 7, 2025).[3] Of these deaths, roughly 42,233 (or about 57 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison,

---

[2] https://www.dea.gov/resources/facts-about-fentanyl.

[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.

in 2023, nearly 47,000 people in the United States died of firearms. *See* John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (March 5, 2025)).[4] And, thanks in part to people like the defendants in this case, our community has been pummeled by fentanyl: in 2023, Washington, D.C., had an opioid overdose death rate of 49.6 people per 100,000—second among all the states and D.C. only to West Virginia. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2023 timeframe).[5] This conduct alone merits the Government's requested sentence.

But the Defendant is guilty of more than drug trafficking. He fraudulently obtained PPP loans and unemployment insurance. As crimes against the public fisc, all are victimized by this conduct. But the most vulnerable are particularly victimized, for these funds are for those in need—not a slush fund for the Defendant. His willingness this money for himself demands the Government's requested sentence.

### 2.    The Defendant's History and Characteristics

While this present conviction will be the Defendant's most serious period of incarceration, this is not the Defendant's first encounter with the criminal justice system. He has two prior gun convictions—one in 2011 and one in 2023. *See* PSR at ¶¶ 149, 151. He has another conviction for Fleeing Law Enforcement, Felony Destruction of Property, and Leaving After Colliding. *See* PSR ¶ 150. There, according to the Proffer of Facts filed in connection with the plea, a U.S. Park Police Officer saw the Defendant driving and followed him. The Defendant failed to stop at two stop signs. The officer pulled over the Defendant and approached him. While the Defendant was being questioned, he fled for 5 to 7 minutes, at times reaching speeds of 60 mph in residential areas. The

---

[4] https://www.pewresearch.org/short-reads/2025/03/05/what-the-data-says-about-gun-deaths-in-the-us/.
[5] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

Defendant eventually crashed into a civilian's parked car and fled on foot until he was apprehended. Unfortunately, these convictions did not dissuade him from engaging in the instant criminal activity. Nor did the opportunities previously afforded to him: his supervision for the fleeing conviction was terminated unsuccessfully, and the supervision for his 2023 gun conviction apparently has not even started because of his arrest in this case. *See* PSR ¶¶ 150-51.

### 3.    Other factors

Given the catastrophic impact of drugs on our community, a sentence of 121 months of imprisonment is warranted. Too many people do not understand or fear the consequences to themselves or their community that flow from this behavior, and they must understand that their conduct is unacceptable. Further, the Government's requested sentence will hopefully provide the Defendant the skills and incentives he needs to make better choices and avoid criminal behavior in the future.

### CONCLUSION

For the foregoing reasons, the Government recommends that the Court sentence the Defendant to 121 months of imprisonment, followed by 60 months of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _/s/ Solomon S. Eppel_
SOLOMON S. EPPEL
Assistant United States Attorney
D.C. Bar No. 1046323
United States Attorney's Office
Violent Crime & Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530